UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

No. 24-3192

————————————————

UNITED STATES OF AMERICA,                                  Appellee,

v.

DOUGLAS EDELMAN,                                              Appellant.

## APPELLEE'S MEMORANDUM OF LAW AND FACT

Douglas Edelman repeatedly and deliberately violated his conditions of pretrial release by contacting two of his co-conspirators, one of whom he promised to help obtain millions of dollars in stock. After extensive briefing and multiple hearings, the district court revoked Edelman's release and ordered him detained pursuant to 18 U.S.C. § 3148(b), finding that Edelman violated his conditions of release and is unlikely to abide by them in the future. Edelman does not contest the violations. And the district court correctly found that he is unlikely to refrain from continuing to contact his co-conspirators. The detention order should be affirmed.

## BACKGROUND

### *Charged Conduct*

In May 2024, Edelman was charged in a 30-count indictment with: conspiracy to defraud the United States, 18 U.S.C. § 371; two counts of making false statements to the Internal Revenue Service, 18 U.S.C. § 1001; fifteen counts of tax evasion, 26 U.S.C. § 7201; and twelve counts of willful violation of foreign bank account reporting requirements, 31 U.S.C. §§ 5314, 5322(b) (12/11/24 Memorandum Opinion (ECF 53) at 2).[1]

"The factual allegations supporting th[e] charges [against Edelman] are extensive" (A2). In short, he is alleged to have "perpetrated a decades-long scheme to defraud the United States of tax revenue by concealing his earnings in an intricate web of financial entities across the globe and by lying to regulators along the way" (*id.*). At the center of the scheme is Mina/Red Star, a defense contracting company that received more than $7 billion in government contracts to provide jet fuel to the U.S. Department of Defense in support of military operations in Afghanistan and the Middle East (*id.*). Although Edelman founded and

---

[1] The district court's 12/11/24 detention order is included as Attachment A and cited as "A."

held a 50% ownership share in Mina/Red Star, he concocted the falsehood that his wife and co-defendant Delphine Le Dain—a French national—founded the business and owned the 50% share (*id.*). Edelman enlisted the help of numerous co-conspirators in his scheme (A3). Ultimately, he evaded taxes on more than $350 million in income from Mina/Red Star and its related entities (*id.*).

### *Arrest and Release*

On July 3, 2024, Spanish authorities arrested Edelman (A3). He was subsequently surrendered to the U.S. Marshals Service and transported to the United States (*id.*). On September 3, 2024, Edelman was arraigned in the district court by Magistrate Judge Moxila A. Upadhyaya (*id.*).

At the arraignment, the parties agreed to specific conditions of release and the government did not seek detention (9/3/24 Transcript (Tr.) 8-15). Among the agreed-upon conditions of release were home detention, GPS monitoring by the Pretrial Services Agency, and a $12.9 million bond (9/3/24 Release Order (ECF 16) at 2-3, 5). Judge Upadhyaya also ordered that, "except for his wife, Delphine Le Dain, [Edelman] shall have no direct contact, other than contact through legal counsel, with the

co-conspirators named or identified in the indictment" (9/3/24 Tr. 12). Edelman swore under oath to abide by these conditions, acknowledging that his release could be revoked if he failed to do so (*id.* at 23-24).

### *Edelman Contacts His Co-Conspirators*

Very soon thereafter, Edelman violated the conditions of his release by contacting two of his co-conspirators: Co-Conspirator 3 and Robert Dooner (Co-Conspirator 4) (A4-5). All told, "Edelman violated the condition that he not contact alleged co-conspirators at least 29 times in just the first 46 days of his pretrial release" (A14-15). These violations were not detected by Pretrial Services but were only discovered after they were reported by his co-conspirators (A13).

On September 7, 2024, just four days after he swore under oath to comply with his release conditions, Edelman texted Dooner on Signal, an encrypted messaging app (A9; see also ECF 45-3 (Dooner Messages)).[2] Edelman continued to text Dooner until at least October 22, 2024, when Edelman changed his settings on Signal so that his messages would

_____

[2] The government set Edelman's counsel a letter identifying Edelman's alleged co-conspirators on September 26, 2024 (A3); however, Edelman "knew at all relevant times that Dooner was Co-Conspirator 4 and that he had been ordered not to contact Dooner for that reason" (A9-10).

disappear one day after being sent (A13). Although the messages disappeared, Dooner reported that Edelman continued to text him after October 22 (*id.*).

In these messages, after some pleasantries, Edelman broached the topic of financial matters, including matters regarding the Galactea Trust, which "holds the assets at the heart of this litigation" (A10). Dooner subsequently asked Edelman to help him free up millions of dollars of Palantir shares owned by Dooner and his family that were held by a Galactea subsidiary (A11). Dooner "emphasized the importance of the Palantir shares to his finances and personal life" (*id.*). In response, Edelman acknowledged that they "should not communicate at all," but nonetheless agreed to "check with" two Galactea advisors (A12). Edelman brought this up again in subsequent messages, stating, among other things, that he was "[t]rying to see what can be done" about Dooner's shares (A12). Dooner told Edelman that "any help with [P]al[antir] would be awesome" given that he would be "pretty much out of cash [by the] end of Oct[ober]" (ECF 45-3 at 6; see also A12). Edelman responded that he "underst[ood]" and was "[w]aiting" for one of the advisors "to get back" to him (*id.*). Dooner obtained the shares in November 2024 (A13).

Separately, on October 12, 2024, Edelman texted Co-Conspirator 3 on WhatsApp, another encrypted messaging app (A8-9; see also ECF 45-2 (Co-Conspirator 3 Messages)). Edelman wished him well and mentioned watching a baseball game (A9). Co-Conspirator 3 did not respond (*id.*).

### Revocation and Detention

On November 27, 2024, the Honorable Collen Kollar-Kotelly held a hearing regarding the violations (A5). Edelman apologized and admitted that he "was wrong" (*id.*). His counsel further stated that Edelman "accepts that this is a violation" and "that it's serious" (*id.*). After the government orally moved for revocation, the court asked for briefing (*id.*).

In its motion to revoke Edelman's pretrial release, the government asserted that revocation and detention were warranted for two alternative reasons (Revocation Motion (ECF 45) at 13). First, under 18 U.S.C. § 3148(b)(2)(A), there was no combination of conditions that would assure that Edelman would not flee or pose a danger to the community (*id.* at 13-19). Second, under § 3148(b)(2)(B), Edelman was unlikely to abide by his conditions of release (*id.* at 19-20).

In Edelman's opposition, he claimed that he would abide by the conditions of his release and proposed four additional conditions: (1) deleting all messaging apps other than his phone's native messaging and email apps, (2) deleting his co-conspirators' contact information, (3) agreeing to random screenings of his phone, and (4) regular check-ins with Pretrial Services (Opposition to Revocation Motion (ECF 46-1) at 14). Edelman asserted that his compliance with other conditions of release showed that he is likely to abide by his conditions in the future (*id.* at 18, 36). Otherwise, Edelman's pleading focused on § 3148(b)(2)(A) and did not squarely address § 3148(b)(2)(B).

In it reply, the government addressed Edelman's proposed additional conditions, explaining why they would not effectively ensure compliance with the condition that he not contact his co-conspirators (Reply in Support of Revocation (ECF 49) at 9-10). Pretrial Services later confirmed its inability to monitor Edelman's use of electronic devices, explaining that it does not possess software capable of remote monitoring and that it could not physically monitor his devices (or detect whether someone provided him with a new device) because it does not conduct home visits (12/11/24 Tr. 18).

Following a December 11, 2024, hearing, the district court revoked Edelman's release and ordered that he be detained pending trial (A1). It found clear and convincing evidence that Edelman knowingly and willfully violated the condition that he not contact his co-conspirators (A8-14). The court then found that Edelman is unlikely to abide by his conditions of release—specifically, that he is unlikely to refrain from contacting his co-conspirators (A14-19). Because the court reached its decision under § 3148(b)(2)(B), it did not address the government's alternative basis for revocation and detention under § 3148(b)(2)(A) (A7).

Four considerations "compel[led]" the district court's conclusion that "nothing short of detention can ensure that Edelman will not contact his alleged co-conspirators" (A14, 19) First, "Edelman's nearly immediate, repeated, and consistent" violations of that condition left the court "with a firm conviction that he is unlikely to be deterred from further violations" (A15). Edelman began communicating with his co-conspirators just four days after promising to not to and messaged them at least 29 times in the first 46 days of his pretrial release (A14-15).

Second, Edelman "knowingly and willfully" violated a "core condition" of release "in a manner that suggests a deliberate effort to

avoid detection" (A16). The condition to not contact co-conspirators was "a central condition of his release tailored specifically to the unique circumstances of his case" (A15). And Edelman's messages with Dooner, in which he "discuss[ed] subjects integral to the case and promis[ed] Dooner financial assistance," were "a particularly serious violation" (*id.*). They "str[uck] at the core purpose of [Edelman's] release condition: avoiding any possibility that he could influence potential witnesses against him" (A15). Edelman, "an intelligent man with sophisticated counsel," demonstrated in his conversations with Dooner that he understood they were not supposed to communicate (A15-16). Yet, in "flagrant disregard" of this restriction, Edelman persisted in communicating with Dooner, using an encrypted messaging app and "avail[ing] himself of the app's automatic deletion feature" (A16).

Third, "Edelman's demeanor and lack of credibility undermine[d] the likelihood that he would comply" with release conditions in the future (A16). Edelman only admitted to the violation once caught (A17). Even then, his briefing "attempted to minimize the gravity of his violation and shift the blame to others through semantic games and obfuscation" (*id.*). Edelman's "demeanor in court, shaking his head and audibly scoffing at

the Government, evince[d] a sense of contempt for the[ ] [revocation] proceedings as a whole" (*id.*). And his messages "reveal[ed] an intent to circumvent and undermine the conditions of release" (*id.*). Based on "Edelman's demonstrated untrustworthiness" and lack of respect for the release order, the court did "not credit his promise to comply" with his conditions of release (A18).

Fourth, even the additional conditions proposed by Edelman "cannot ensure future compliance" (A18). Despite being subject to home detention with GPS monitoring and weekly meetings with Pretrial Services, Edelman's violations evaded detection and were only brought to light because his co-conspirators reported them (A18-19). Pretrial Services lacks the ability to electronically monitor a defendant's phones and online activity (A19). And physical inspections can be easily evaded: Edelman "could delete any prohibited application or contact to avoid detection during his visits [with Pretrial Services] and reinstall them later" (*id.*). Pretrial Services also lacks the capacity to conduct home visits, monitor who enters Edelman's residence, or determine what devices are made available to him (*id.*). Therefore, "even confining Edelman to his residence at all hours of every day could not guarantee

that Edelman does not receive a different device with the prohibited applications and contacts" (*id.*). Given these constraints, "Edelman's proposed conditions boil[ed] down to a request that the Court trust him to comply" (*id.*). But Edelman had "already abused th[e] court's trust," and "nothing short of detention c[ould] ensure that Edelman will not contact his alleged co-conspirators" (*id.*).

## ARGUMENT

### A.    Applicable Legal Principles and Standard of Review.

Under the Bail Reform Act, a district court must release a defendant on the "least restrictive" combination of conditions that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c). Once released, a defendant who violates one of these conditions is "subject to a revocation of release[.]" § 3148(a). Revocation and detention are mandatory if the district court:

(1) finds that there is—

. . .

(B) clear and convincing evidence that the person has violated any other condition of release; and

(2) finds that—

    (A) based on the factors set forth in [§ 3142(g)], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

    (B) the person is unlikely to abide by any condition or combination of conditions of release.

§ 3148(b). "[A] district court's finding that a defendant will not abide by any conditions of release may be established by a preponderance of the evidence." *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990); *accord United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986) (holding that preponderance-of-the-evidence standard applies to risk of flight).

This Court "review[s] release and detention orders pursuant to the Bail Reform Act, 18 U.S.C. § 3142 *et seq.*, for clear error." *United States v. Hale-Cusanelli*, 3 F.4th 449, 454 (D.C. Cir. 2021). "The clear error standard applies not only to the factual predicates underlying the district court's decision, but also to its overall assessment, based on those predicate facts[.]" *Id.* at 454-55 (cleaned up). This standard is "highly deferential." *Id.* at 455. The Court "will find clear error only when although there is evidence to support a finding or ruling, the reviewing court on the entire evidence is left with the definite and firm conviction

that a mistake has been committed." *Id.* (cleaned up). Where "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (cleaned up).

Nowhere addressing *Hale-Cusanelli*, Edelman advocates (at 3-5) for "independent review" that would subject the district court's findings to more rigorous scrutiny. While this Court has not explicitly addressed the appropriate standard of review for "detention based upon a finding that the defendant was unlikely to abide by conditions of release," *United States v. Manafort*, 897 F.3d 340, 346 n.2 (D.C. Cir. 2018), it laid out the general rule for review of detention orders in *Hale-Cusanelli*. That decision's clear-error standard has been applied to district court determinations of both dangerousness and flight risk. *Hale-Cusanelli*, 3 F.4th at 454-55; s*ee United States v. Munchel*, 991 F.3d 1273, 1282 (D.C. Cir. 2021) (dangerousness); *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019) (flight risk). It applies here too.

Edelman's reliance (at 4) on out-of-circuit caselaw is misplaced. These decisions are not binding, and they are inconsistent with this Court's own precedent. Other courts also review pretrial release determinations for clear error. *See United States v. Zhang*, 55 F.4th 141,

146 (2d Cir. 2022); *United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989) (en banc).[3] And Edelman fails to explain why a district court's finding that a defendant is unlikely to comply with his release conditions should be reviewed differently than its finding that a defendant is dangerous or a flight risk. Indeed, although "[t]he circuits have long been split" on which standard of review to apply to pretrial detention decisions, they "appear to agree that the standard is the same for an initial release or detention decision and a decision to revoke release." *United States v. Wilks*, 15 F.4th 842, 847 (7th Cir. 2021). This Court's "review of a revocation decision should therefore be no more—and no less—searching than [its] review of an initial release or detention decision." *Id.* Clear-error review thus applies.

---

[3] Many other courts review factual findings underlying the ultimate detention decision for clear error. *See, e.g.*, *United States v. Flores*, 53 F.4th 313, 315 (5th Cir. 2022); *United States v. Howard*, 793 F.3d 1113, 1113 (9th Cir. 2015); *United States v. Wingo*, 490 F. App'x 189, 190 (11th Cir. 2012); *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). Thus, even if the Court were to ignore *Hale-Cusanelli*, the district court's factual finding that Edelman is unlikely to abide by the conditions of his release should still be reviewed for clear error.

## B.    The Detention Order Should Be Affirmed.

The district court's decision to revoke Edelman's release and order pretrial detention under § 3142(b)(2)(B) stands on solid ground. Edelman deliberately and repeatedly violated the conditions of his release by contacting his co-conspirators, doing so almost immediately after he swore under oath that he would not and in a way that "str[uck] at the core purpose of [Edelman's] release condition: avoiding any possibility that he could influence potential witnesses against him" (A15). The district court did not err, clearly or otherwise, when it concluded that detention is appropriate because Edelman is "unlikely to abide" by the conditions of his release.

There is no dispute that Edelman knowingly and willfully violated the condition not to directly contact his co-conspirators. He initiated that contact just four days after swearing to abide by the conditions of release and acknowledging the repercussions of failing to do so (A14-15). Edelman flagrantly flaunted the no-contact condition, writing to one of his co-conspirators that they "should not communicate at all," and then proceeding to discuss, and offer assistance regarding, stock held by a trust that holds the assets at the center of Edelman's fraudulent scheme

(A10-14). Edelman violated the no-contact condition at least 29 times over the course of the first 46 days of his release—all while subject to one of the most restrictive possible forms of pretrial release (A14-15). He did so using encrypted messaging apps and eventually enabled one of the app's automatic deletion feature, ensuring that subsequent messages were not preserved (A16).

In other words, Edelman "knowingly and willfully violated a core condition of release and did so in a manner that suggests a deliberate effort to evade detection" (A16). Had Edelman's co-conspirators not reported the contacts, "none of Edelman's violations would have come to light" (*id.*). Even then, Edelman minimized—and, on appeal, continues to minimize—the violations (A17). And, as the district court found, "his demeanor in court . . . evince[d] a sense of contempt for the[ ] proceedings as a whole" (*id.*). Pretrial Services cannot prevent Edelman from contacting his co-conspirators again in the future: the Agency "lacks the capacity to monitor defendants' phones and online activity" and cannot "conduct home visits, monitor who enters Edelman's residence, or determine what devices are available to him" (A18-19). Under these circumstances, the trial court appropriately concluded that "nothing

short of detention can ensure that Edelman will not contact his alleged co-conspirators" (A19).

## C. Edelman's Arguments Are Meritless.

Edelman does not contest that he repeatedly violated the conditions of his release. Nor does he seriously contest most of the district court's factual findings. Instead, ignoring the bulk of the district court's comprehensive analysis, he raises two legal challenges to the detention order. First, he faults the district court for employing a preponderance-of-the-evidence standard in finding that he is unlikely to abide by the conditions of release. Second, he claims that § 3148(b)(2)(B) does not allow for his detention because "his violations did not significantly interfere with court proceedings and he was not given a warning or opportunity for reform." Edelman did not raise either of these claims below and they are therefore subject to plain-error review. *In re Sealed Case*, 349 F.3d 685, 690-91 (D.C. Cir. 2003); *see United States v. Bauer*, No. 21-3068, 2022 WL 298923, at *1 (D.C. Cir. Jan. 24, 2022) (applying plain-error review to challenge to § 3148(b) revocation order). Regardless, under any standard, Edelman's challenges are meritless.

### 1.    The District Court Properly Applied a Preponderance Standard.

Edelman argues for the first time on appeal (at 5-10) that the appropriate standard of proof for a § 3148(b)(2)(B) determination is clear and convincing evidence. Because there is neither "controlling precedent on the issue" nor "some other absolutely clear legal norm," Edelman's argument fails under plain-error review. *See United States v. Little*, 123 F.4th 1360, 1370 (D.C. Cir. 2024) (quotation marks omitted). And even if the district court plainly erred as to the standard, any error did not "affect[ ] [Edelman's] substantial rights." *Id.* The record underlying the district court's finding that Edelman is unlikely to abide by the no-contact condition—discussed at length above—easily satisfies the clear-and-convincing standard.[4]

---

[4] For the same reason, any error was harmless. Nowhere in its detention order did the district court suggest that the standard of proof was outcome determinative. To the contrary, its comprehensive findings readily establish that it would have detained Edelman even if a clear-and-convincing standard applied. *See generally United States v. Montalvo-Murillo*, 495 U.S. 711, 722 (1990) (error harmless where it had "no substantial influence on the outcome of the proceeding" because defendant "would have been detained" anyway).

In any event, the district court's application of a preponderance-of-the-evidence standard in its § 3148(b)(2)(B) determination was not error. As other circuits and numerous district courts have recognized, a "finding that a defendant will not abide by any conditions of release may be established by a preponderance of the evidence." *Aron*, 904 F.2d at 224; *see United States v. Gotti*, 794 F.2d 773, 778 (2d Cir. 1986) ("findings made under section 3148(b)(2) may be established by a preponderance of the evidence"); A8 n.4 (citing district court decisions).

*United States v. Salerno*, 481 U.S. 739 (1987), upon which Edelman relies (at 7-9), does not hold otherwise. In *Salerno*, the Supreme Court upheld the constitutionality of pretrial detention under § 3142 based on a defendant's dangerousness, finding that such detention is "consistent with the Due Process Clause" where the government "proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community." 481 U.S. at 751. This holding must be understood in context of the express statutory requirement that dangerousness determinations at an initial hearing "be supported by clear and convincing evidence." § 3142(f). *Salerno* had no occasion to consider other standards of proof that may apply elsewhere.

Indeed, *Salerno* did not address—or even mention—revocation of release under § 3148, which is meaningfully different than detention at an initial hearing under § 3142. At an initial hearing, a court must determine whether any set of conditions will reasonably assure the defendant's appearance and the safety of others and the community, and then impose the "least restrictive" combination of conditions to achieve that purpose. *See* § 3142(c)(1)(B). Revocation under § 3148, however, arises where a defendant has violated the very conditions imposed to ensure his appearance and the safety of others. As the Second Circuit recognized, "§ 3142 and § 3148 provide quite different avenues to detention before trial, and it does not seem logical that section 3148(b)(2) would borrow a standard of proof from section 3142(f), which concerns initial bail proceedings only." *Gotti*, 794 F.2d at 778 (cleaned up).

Contrary to Edelman's suggestion (at 7-8), *Salerno* does not "speak[ ] to *all* predictive detention decisions, including pretrial detention based on a defendant's potential dangerousness, risk of flight, or likelihood of non-compliance with a court order." To the contrary, this Court has repeatedly made clear that "[a] determination that an individual is a flight risk must be supported by a preponderance of the

evidence." *Vasquez-Benitez*, 919 F.3d at 551; *see Vortis*, 785 F.2d at 328-29. Edelman's proposed interpretation of *Salerno* cannot be squared with this Court's precedent.

Finally, Edelman places entirely too much weight (at 7, 10) on a single word in the Bail Reform Act's legislative history. The Senate Report's one-time use of "clear" does not suggest that Congress intended § 3148(b)(2)(B)'s "unlikely to abide" standard to be proved by clear and convincing evidence. If that were Congress's intent, it would have said so in the statute—just as it did a few lines earlier in § 3148(b)(1)(B) (requiring "clear and convincing evidence" of violation). "Specification of the 'clear and convincing' standard in [§ 3148(b)(1)(B)] and the absence of such a standard in [§ 3148(B)(2)] suggest that subsection (2) requires a different and less demanding standard." *Gotti*, 794 F.2d at 777; *cf. Vortis*, 785 F.2d at 328-29 (applying preponderance standard—the standard "applicable to other kinds of pretrial proceedings"—to flight-risk determination because statute expressly requires clear and convincing evidence for dangerousness determination but is silent as to flight).

### 2. Edelman's Novel Rule for § 3148(b)(2)(B) Should Be Rejected.

Fashioning a novel rule out of whole cloth, Edelman asserts for the first time on appeal (at 10-19) that "§ 3148(b)(2)(B) detention is only warranted if (i) a defendant's conduct constitutes a significant danger to judicial proceedings, and (ii) he has failed to correct his violations despite warnings and opportunities to reform." Applying this rule to his own circumstances, Edelman argues (at 19-24) that the district court erred by ordering him detained. Edelman is wrong on both accounts.

As above, Edelman's argument fails under plain-error review because there is neither "controlling precedent on the issue" nor an "absolutely clear legal norm[.]" *Little*, 123 F.4th at 1370 (quotation marks omitted). Nonetheless, Edelman's novel rule should be rejected under any standard of review. It is untethered from the statutory language, and Edelman cites no precedent that compels—or even suggests the necessity of—such a rule.[5] The plain language of § 3148(b)(2)(B) is clear and says

---

[5] The cases cited by Edelman do not help his cause. *Salerno* does not address revocation of release under § 3148. Neither do *Johnson v. United States*, 576 U.S. 591 (2015), or *Bell v. Wolfish*, 441 U.S. 520 (1979). Similarly, this Court's statement in *Munchel*, 991 F.3d at 1283, regarding the necessity of dangerousness or flight-risk findings to a detention order,

(continued . . . )

nothing about either "a significant danger to judicial proceedings" or "warnings and opportunities to reform." And, contrary to Edelman's cursory assertions (at 10-12), courts do not need guidance on how to assess defendants' likelihood of compliance under § 3148(b)(2)(B). Judges are well-equipped and capable of making such factual determinations based on the record in any given case.

Edelman's arguments in support of his proposed rule rest on a fundamental misunderstanding of how the Bail Reform Act works. Section 3148(b)(2)(B) is not a standalone provision. It addresses violations of conditions imposed under § 3142, which requires courts to impose the "least restrictive conditions" that "will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." § 3142(c)(1)(B). Violations of these conditions—criminal or otherwise—necessarily threaten "the societal

---

relates to initial release decisions under § 3142, not revocation under § 3148. *Bitter v. United States* predates the Bail Reform Act and addresses a situation entirely distinguishable from that presented here, holding that revocation of bail was "unjustified" where it was based on a "single, brief incident of tardiness[.]" 389 U.S. 15, 16-17 (1967). Finally, none of the district court cases cited by Edelman (at 16-17) hold that a warning or "second strike" is necessary under § 3148(b)(2)(B), and this Court's decision in *Manafort*, 897 F.3d at 348, suggests no such rule.

interests" the Bail Reform Act is designed to protect. S. Rep. No. 98-225 at 8 (1983). Where, as here, a defendant who is already subject to one of the most restrictive possible forms of pretrial release (A14-15) violates those conditions and is unlikely to comply in the future, detention is warranted even if he has not been given an opportunity to reform.

Finally, even were the Court to apply the standard invented by Edelman it would not move the needle significantly in his favor. Edelman repeatedly violated a core condition of his release immediately after swearing to abide by his release conditions. Edelman's violations—at least 29 in the first 46 days of his release—reflected a deliberate pattern noncompliance with the conditions imposed to guard against witness tampering. *See generally Manafort*, 897 F.3d at 348 (affirming detention under § 3148(b) where, *inter alia*, defendant had "repeated communications with potential witnesses").

Edelman attempts to downplay (at 19-22) the import of his messages, claiming that "most were harmless, trivial conversations between two friends" and that "there is no evidence showing Edelman's promise [to Dooner] could or actually did ingratiate him to Dooner any more than being his friend of thirty years already had." These assertions

are incorrect, and they also miss the point. The no-contact condition reflects the potential harm of *any* communication. Nurturing his friendships with co-conspirators and potential witnesses—even through pleasantries—presents the risk of danger to the integrity of the judicial proceeding. *See, e.g.*, *United States v. LaFontaine*, 210 F.3d 125, 134 (2d Cir. 2000) ("pretrial detention [i]s even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness"); *United States v. Gilley*, 771 F. Supp. 2d 1301, 1307 (M.D. Ala. 2011) (revoking release based on a defendant's violation of a no-contact condition; "two motives may co-exist at the same time"). This threat is all the more pronounced where, as here, "Edelman repeatedly promised an alleged co-conspirator and cooperating witness that he would help secure him millions of dollars by coordinating with advisors to the trust" (A13-14).

Without seriously engaging with the district court's reasoning, Edelman casts its conclusion about his likelihood of future compliance (at 22-24) as a "flawed prediction." But this conclusion was not based on "'a judicially imagined' situation" or on government proffers alone, as

Edelman suggests (at 23). Rather, it was based on Edelman's immediate, persistent, and deliberate violations of his no-contact condition. And the purported "pattern of cooperation" identified by Edelman (at 23-24)—even if fully credited—does not change this calculus. Regardless of his compliance with other conditions, "Edelman has proven himself untrustworthy on this [no-contact] issue" (A17). And, given Pretrial Services' inability to "monitor Edelman's electronic devices" or "conduct home visits, monitor who enters Edelman's residence, or determine what devices are available to him," future compliance would hinge entirely on Edelman's good-faith compliance (A18-19). Under these circumstances, the district court properly found that "nothing short of detention can ensure that Edelman will not contact his alleged co-conspirators" (A19). See *United States v. Hir*, 517 F.3d 1081, 1093 n.13 (9th Cir. 2008) (affirming detention order, noting that "any set of conditions, short of creating a 'replica detention facilit[y],' would necessarily hinge on [appellant's] good faith compliance").[6]

---

[6] If the Court disagrees with the district court's detention order, it should remand for consideration of whether, "based on the factors set forth in [§ 3142(g)], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety

(continued . . .)

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court affirm the district court's detention order.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
Assistant United States Attorney

_____/s/_____
DANIEL J. LENERZ
D.C. Bar #888283905
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Daniel.Lenerz@usdoj.gov
(202) 252-6829

---

of any other person or the community." § 3148(b)(2)(A). Although raised by the government, the district court did not address this issue because it granted the government's motion under § 3148(b)(2)(B) (A7). The district court is best situated to address § 3148(b)(2)(A) in the first instance. *See United States v. Stanley*, 469 F.2d 576, 581-82 (D.C. Cir. 1972) (remanding for additional findings, noting that "[t]he trial court is . . . the superior tribunal for the kind of information gathering which a sound foundation for a bail ruling almost inevitably requires").

## CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this motion contains 5,182 words, and therefore complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). This motion has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
DANIEL J. LENERZ
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing motion to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Sonya C. Bishop, Esq., sonya.bishop@bakermckenzie.com, on this 3rd day of February, 2025.

/s/
DANIEL J. LENERZ
Assistant United States Attorney